IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ABDALLAH HAWA and | : | CIVIL ACTION |
| TERESA POWELL, | : | |
| | : | |
| Plaintiffs, | : | No. 15-4828 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| COATESVILLE AREA SCHOOL DISTRICT, | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM AND ORDER

**MARILYN HEFFLEY, U.S.M.J.**                          **February 26, 2016**

Before this Court is the Motion to Dismiss (Doc. No. 28) of Defendants Richard Como ("Como") and Angelo Romaniello ("Romaniello") (collectively, "Defendants"). Defendants move to dismiss Counts I through III of the Amended Complaint as to Plaintiff Abdallah Hawa ("Hawa"), but not as to Plaintiff Teresa Powell ("Powell") (collectively, "Plaintiffs").[1] For the reasons that follow, Defendants' Motion to Dismiss will be granted.

## I.   BACKGROUND

In this action, Plaintiffs assert claims alleging violations of 42 U.S.C. §§ 1981, 1983, Title VII, 42 U.S.C. § 2000(e), the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1201 et seq., the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 et seq., the Rehabilitation Act, 29 U.S.C. § 794, the Family Medical Leave Act ("FMLA"), 29 U.S.C.

---

[1]     In their opposition to the Motion to Dismiss (Doc. No. 34), Hawa and Powell have withdrawn Count II of the Amended Complaint. Opp. at 1 n.1. Accordingly, Count II is dismissed as to both Plaintiffs with prejudice.

§ 2601 et seq., and the Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. § 1421 et seq.

In support of these claims, Plaintiffs' Amended Complaint sets forth the following allegations. Hawa is employed as the Director of Technology for CASD. He is of Lebanese-American descent. Amended Complaint (Doc. No. 15) ¶¶ 17-18 ("Am. Compl."). Powell is employed as the Director of Middle School Education for CASD. She is of African-American descent. Id. ¶¶ 19-20. In or about late spring of 2013, Hawa issued a new cellular telephone to CASD's Athletic Director, James Donato ("Donato"). Id. ¶ 22. As a result, Donato returned his previously issued telephone to Hawa. Id. ¶ 23. On or about August 15, 2013, Hawa retrieved Donato's former telephone from storage and began clearing it for issuance to another employee. Id. ¶ 24. In so doing, he discovered numerous racist text messages exchanged between Richard Como ("Como"), CASD's former Superintendent, and Donato, referring to certain CASD employees in racially derogatory terms. Id. ¶ 25. In addition, he discovered text messages containing suspicious references to the use of taxpayer money for improper purposes. Id. ¶ 26. Hawa brought the text messages to the attention of Powell. Id. ¶ 28. Powell suggested that they bring the matter to the attention of Dr. Tonya Thames Taylor ("Taylor"), a CASD School Board member and President of the local chapter of the National Association for the Advancement of Colored People. Id. After reviewing the text messages, Taylor recommended that Hawa and Powell bring the messages to the attention of CASD's School Solicitor, James Ellison, Esquire ("Ellison"). Id. ¶ 29.

Ellison met with Hawa, Powell and Taylor on August 17, 2013 at Scott Middle School to review and discuss the text messages. Id. ¶ 31. Ellison stated that he would immediately apprise the President and Vice President of the CASD School Board of the test messages. Both Ellison and Taylor expressed concern regarding the text messages being made public. Id. They stated,

however, that they would schedule a meeting with the School Board's Finance Committee to discuss the matter.  <u>Id.</u> ¶ 33.  While exiting the building after the meeting concluded, Ellison noticed video surveillance cameras in the Scott Middle School parking lot and inquired whether they were functional.  <u>Id.</u>  Upon being informed by Hawa that the cameras were operational, Ellison directed Hawa to erase the camera footage of them in the parking lot so that no one would know that they had met.  <u>Id.</u> ¶ 34.  Hawa did not comply with that directive.  <u>Id.</u>

Ellison informed the Finance Committee of the text messages, and the members of the Committee directed him to investigate further.  <u>Id.</u> ¶ 36.  Subsequently, upon being confronted with the text messages, Como admitted to sending them.  <u>Id.</u> ¶ 37.  Taylor informed Hawa and Powell that the Finance Committee had decided to allow Como to remain in his position as Superintendent until the end of the school year, at which time he would retire.  Taylor told Hawa and Powell that this resolution would allow the CASD School Board to remedy the problem without making the text messages public.  <u>Id.</u> ¶ 38.  Following that event, Como began to "pester" Hawa on a daily basis, asking how the Finance Committee had become aware of the text messages and demanding that Hawa provide him with Donato's previous telephone that contained the text messages.  <u>Id.</u> ¶ 41.

On or about August 22, 2013, Powell asked Taylor whether the entire School Board had been informed of the Como and Donato text messages, and she replied that only the Finance Committee had been made aware of them.  <u>Id.</u> ¶ 42.  Fearing that the School Board was attempting to cover up the text messages, Powell wrote an anonymous letter to the full School Board, bringing the text messages to its attention.  <u>Id.</u>  On August 23, 2013, Taylor telephoned Powell and informed her that the School Board had received the anonymous letter and that she believed Hawa had authored it because it contained "numerous grammatical and typographical

3

errors."  Id. ¶ 43.  Taylor referred to Hawa as a "turncoat" and stated that he had "messed up" by

informing the entire School Board of the text messages.  Id. ¶ 44.  Upon learning of this

conversation from Powell, Hawa emailed the full text message transcript to the Chester County

District Attorney's Office (the "District Attorney's Office ").  Id. ¶ 45.  On the same day, the full

School Board held an emergency meeting regarding the text messages.  Id. ¶ 46.  At the meeting,

Ellison informed the School Board that the District Attorney's Office had demanded that

Donato's cellular telephone be turned over to it so that it could investigate the potential misuse of

public funds referenced in the text messages.[2]  Id.  The School Board assigned Ellison to conduct

an investigation into the text messages and to provide recommendations at its next executive

session.  Id. ¶ 47.

On or about August 26, 2013, Taylor informed Powell that the School Board planned to

discuss an exit plan for Como in order to protect itself from liability.  Id. ¶ 52.  Under that exit

plan, Como would resign rather than be terminated.  Id.  On or about August 27, 2013, Como

called a directors meeting and informed those present that he was contemplating retirement.  Id.

¶ 55.  Upon receiving the results of Ellison's investigation, the School Board instructed Ellison

to inform Como and Donato that they were being suspended without pay pending termination,

unless they elected to resign.  Id. ¶ 57.  Both men agreed to resign.  Id. ¶ 58.  Subsequently, the

School Board issued a press release on its website announcing that Como had decided to retire.

The announcement did not mention Donato's resignation and did not mention the text messages.

Id. ¶ 62.

---

[2]   When Donato's telephone was provided to the District Attorney's Office, however, all of the
incriminating text messages had been erased.  Id. ¶ 51.

Due to the abrupt nature of Como's retirement and Donato's resignation, members of the media made requests under Pennsylvania's Right to Know Law for information relating to their cellular telephone records.  Id. ¶ 68.  Ellison had attorneys at his law firm research whether the School Board could withhold the text messages from disclosure.  Id. ¶ 69.  In response to press inquiries, the School Board stated that Como and Donato had submitted letters of resignation, but refused to comment further because the matter was the subject of an ongoing investigation by the District Attorney's Office and involved personnel issues.  Id. ¶ 70.  Hawa and Powell, believing that the School Board was involved in a cover-up, met with a reporter and provided the reporter with the entire text message transcript.  Id. ¶ 71.

On or about September 24, 2013, Hawa and Powell attended a public School Board meeting and revealed themselves as the individuals who discovered and reported the racist text messages.  Id. ¶ 75.  Powell read a statement that accused Ellison and various School Board members of attempting to cover up the text messages.  Id. ¶¶ 76-77.  Following that meeting, Ellison focused his internal investigation almost exclusively on Hawa and Powell "in an attempt to terminate and/or discipline and/or force them out of their positions of employment."  Id. ¶ 80.  Toward that end, Ellison directed Acting Superintendent, Romaniello, and Director of Human Resources, Erika Zeigler ("Zeigler"), to document their interactions with Hawa and Powell and to specifically note when and if they deviated from school policies or procedures.  Id. ¶ 81.  In addition, Ellison directed attorneys in his law firm to conduct research regarding the School Board's ability to discipline or terminate Powell.  Id. ¶¶ 83-90.

On or about September 27, 2013, Ellison engaged Reclamere, Inc. ("Reclamere"), a computer forensics company, and directed it to image the hard drives and servers in Hawa's IT Department.  Id. ¶¶ 91-94.  In order to access the servers, Ellison instructed Romaniello to call

the IT Network Manager and obtain the list of passwords for the School District's servers.  Id. ¶ 96.  The IT Network Manager informed Romaniello that there was no list of passwords and that Romaniello should contact Hawa to obtain the passwords.  Id.  A dispute ensued in which Romaniello demanded that the IT Network Manager, and then Hawa, himself, provide him with the passwords upon threat of discipline.  Id. ¶¶ 96-106.  As the dispute unfolded, Hawa informed the District Attorney's Office, which sent a letter to Ellison directing him to preserve his cellular phone and iPad data, as well as all files on CASD's system for use in the investigation.  Id. ¶¶ 101-02.  Ellison responded to the District Attorney's Office's letter by stating that:

> We are taking extraordinary steps at our cost to secure our computer systems and . . . preserve all information in its present state, not only for your investigation but in anticipation of litigation as clearly required by the Rules of Civil Procedure given the fact that both Dr. Powell and Mr. Hawa put us on notice that they have secured counsel in connection with their employment with CASD.

Id. ¶ 109.

Ultimately, Hawa relented and provided the passwords.  Id. ¶ 107.  On or about September 29, 2013, Ellison and Romaniello directed representatives from Reclamere to image four specific hard drives belonging to Hawa and his subordinates, the Network Manager and the Assistant Network Manager.  Id. ¶ 110.  On October 2, 2013, Ellison instructed Reclamere to image CASD's network servers and to archive all school video camera surveillance footage.  Id. ¶ 117.  Ellison and Romaniello ordered the hard drive and server imaging despite the preservation communication from the District Attorney's Office.  Id. ¶¶ 110, 117-121.  Ellison then instructed Reclamere to perform searches of the email accounts belonging to Powell and Hawa and two principals at CASD who were personal friends of Powell.  Id. ¶ 140.

In October 2013, Hawa and Powell were subpoenaed to testify before and bring documents to a grand jury investigating the possible misuse of taxpayer funds by Como and Donato.  Id. ¶ 122.  At or around the same time, Hawa met with detectives from the District

Attorney's Office in the Brenner Administration Building.  Id. ¶ 125.  Ellison directed Romaniello to threaten Hawa with discipline for "not doing his job" and "disrupting the workplace."  Id.  On or about October 18, 2013, the day after Powell's scheduled testimony before the grand jury, Ellison instructed her to attend a surprise meeting with Zeigler regarding the events surrounding the Como and Donato text messages.  Id. ¶¶ 128-29.  Zeigler instructed Powell that she was not permitted to speak to her attorney prior to the meeting or to have her attorney present while she was questioned and that she would be terminated if she did not cooperate.  Id. ¶¶ 130-31.  Powell declined to respond to questions under those circumstances. Id. ¶ 131.  Zeigler subsequently made further efforts to obtain an interview with Powell, but eventually abandoned her efforts after Powell questioned her demands in writing.  Id. ¶ 133.

On October 22, 2013, the School Board met with Ellison to discuss retaining outside counsel to handle the matters related to the text messages going forward.  Id. ¶ 144.  Outside counsel was retained and instructed to review the conduct of Hawa and Powell in order to justify their terminations.  Id. ¶¶ 144-47.  The School Board subsequently took retaliatory actions against Powell, including denying her a 4% annual salary raise that was awarded to other employees, denying her request to temporarily assume the principal's role at a school where the previous principal had retired, stripping her of certain job duties, no longer affording her an office at CASD's central office building and structuring a new position for an Assistant Superintendent to require one more year of experience than she possessed.  Id. ¶¶ 150-55.

On March 21, 2014, CASD appointed Dr. Cathy Taschner ("Taschner") as its new Superintendent.  In September 2014, Taschner began stripping Hawa of job duties, including removing his decision-making power with respect to purchasing software and equipment and excluding him from crucial administrative meetings during which decisions were made regarding

CASD's IT Department.  Id. ¶¶ 164-66.  In November 2014, CASD issued an unjustified letter of reprimand to Hawa for allegedly collecting funds for an unauthorized purchase.  Id. ¶ 167.

Due to the shock and stress resulting from the School Board officials' conduct, Hawa was diagnosed with stress and an anxiety disorder in November 2014.  Id. ¶ 168.  In December 2014, Hawa commenced a medical leave pursuant to the FMLA.  Id. ¶ 169.  In May 2015, following the exhaustion of his 12-week FMLA leave, Hawa began an unpaid sabbatical for restoration of health as an accommodation of his disability.  Id.  At that time, Taschner removed Hawa's access to his CASD email account, barred him from CASD facilities and replaced him with an individual who was not disabled.  Id. ¶¶ 170-71.

## II.   **STANDARD OF REVIEW**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  Id.  (quoting Twombly, 550 U.S. at 556-57 (internal quotation marks omitted)).  "In light of Twombly, 'it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts suggestive of [the proscribed conduct].'"  Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 177 (3d Cir. 2010) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)).  "'[S]tating .

. . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. . . ."  Great Western Mining, 615 F.3d at 177 (quoting Twombly, 550 U.S. at 556).  It requires "'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'"  Id. (quoting Twombly, 550 U.S. at 556).  In determining the adequacy of a complaint, this Court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to plaintiff."  Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011).

**III.   ANALYSIS**

### A.  Hawa Has Failed to State a First Amendment Retaliation Claim Because He Has Not Alleged an Actionable Adverse Employment Action

Hawa alleges that Como and Romaniello retaliated against him for exercising his First Amendment right to speak about Como and Donato's racist emails and CASD's conduct in connection therewith in violation of 42 U.S.C. § 1981, which ensures equal protection in the making and performance of contracts.[3]  Claims for violation of Section 1981 can only be brought by way of an action under 42 U.S.C. § 1983.  McGovern v. City of Philadelphia, 554 F.3d 114, 115 (3d Cir. 1996); see Dieffenbach v. Dept. of Revenue, 490 F. App'x 433, 435 (3d Cir. 2012).

---

[3]    Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> . . .
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

To plead a prima facie case for a First Amendment retaliation claim under Section 1983, a plaintiff must allege that: (1) he or she engaged in speech protected by the First Amendment; (2) the government responded with retaliatory action that would cause a person of ordinary firmness not to exercise his or her First Amendment right; and (3) there is a causal link between the retaliation and the protected speech.  Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006).  "'A prima facie case is an evidentiary standard, not a pleading requirement.'" Connelly v. Lane Constr. Corp., 809 F.3d 180, 789 (3d Cir. 2016) (quoting Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 510 (2002)).  It, therefore, is "'not a proper measure of whether a complaint fails to state a claim.'"  Id. (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 213 (3d Cir. 2009)).  Instead, the measure of whether a plaintiff has adequately stated a claim is whether the complaint contains "sufficient factual allegations to raise a reasonable expectation that discovery will reveal evidence of the [necessary] elements."  Id.

Here, Defendants do not challenge that Hawa engaged in conduct protected by the First Amendment.  They argue, however, that Hawa has failed to allege that they engaged in actionable retaliatory conduct.  Def.'s Br. (Doc. No. 28) at 9-12.  The standard for alleging retaliatory conduct is generous.  As the Third Circuit has explained:

> First Amendment retaliation claims are always individually actionable, even when relatively minor. Even "an act of retaliation as trivial as failing to hold a birthday party for a public employee," if "intended to punish her for exercising her free speech rights," may be actionable if under the circumstances it would be sufficient to "deter a person of ordinary firmness" from exercising his or her First Amendment rights.  A First Amendment retaliation claim will lie for any individual act which meets this "deterrence threshold," and that threshold is very low . . . a cause of action is supplied by all but truly de minimis violations.

O'Connor v. City of Newark, 440 F.3d 125, 127-28 (3d Cir. 2006) (quoting Suppan v. Dadonna, 203 F.3d 228, 234–35 (3d Cir. 2000)).  Retaliatory conduct is not limited to actions such as termination, demotion or reduction in pay.  Instead, "being the victim of petty harassments in the

workplace as a result of speaking on matters of public concern is in itself retaliation—even if the employee cannot prove a change in the actual terms of his or her employment—and thus could be actionable under the First Amendment." McKee v. Hart, 436 F.3d 165, 169-70 (3d Cir. 2006). "In other words, a pattern of petty harassments is actionable even if the 'employee cannot prove a change in the actual terms of his or her employment,' so long as the effect of the harassment on the employee's freedom of speech is more than de minimis." Manna v. Twp. of Fairfield, No. 04-CV-1430WJM, 2007 WL 3231894, at *2 (D.N.J. Oct. 30, 2007) (quoting Suppan, 203 F.3d at 235).

Nevertheless, to be actionable the retaliatory conduct must be more than de minimis. Id. Thus, "'[c]ourts have declined to find adverse action where the 'alleged retaliatory acts were criticism, false accusations or verbal reprimands.'" Revell v. City of Jersey City, 394 F. App'x 903, 906 (3d Cir. 2010) (quoting Brennan v. Norton, 350 F.3d 399, 419 (3d Cir. 2003)). Moreover, "an internal investigation, without subsequent demotions, terminations, reductions in pay, transfers, or other similar adverse impacts on an employment situation, [is] not sufficient to sustain a First Amendment retaliation claim." Hammond v. City of Wilkes-Barre, No. 3:13-2322, 2015 WL 75168, at *4 (M.D. Pa. Jan. 6, 2015), aff'd , No. 15-1339, 2015 WL 5915956 (3d Cir. Oct. 9, 2015) (citing Lakkis v. Lahovski, 994 F. Supp. 2d 624, 632–33 (M.D. Pa. 2014); accord Peltier v. United States, 388 F.3d 984, 988 (6th Cir. 2004); Jones v. Fitzgerald, 285 F.3d 705, 715 (8th Cir. 2002); Benningfield v. City of Houston, 157 F.3d 369, 376 (5th Cir. 1998); Herman v. Hosterman, No. 1:11-cv-898, 2011 WL 4974181, at *3 (M.D. Pa. Oct. 19, 2011).

To plead a First Amendment retaliation claim against an individual, a plaintiff must allege that the individual defendant participated in the retaliatory action. "A defendant in a civil rights action must have personal involvement in the alleged wrongs . . . . [P]ersonal involvement

11

can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1998) (citations omitted). "When there is more than one defendant, the employee must show that each defendant individually participated or acquiesced in each of the alleged constitutional violations." Smith v. Cent. Dauphin Sch. Dist., 355 F. App'x 658, 667 (3d Cir. 2009). Thus, it is necessary to consider the adequacy of Hawa's allegations against each of the Defendants separately.

### 1.  Como

In support of his First Amendment retaliation claim against Como, Hawa points only to a single allegation in his Amended Complaint regarding retaliatory action that Como personally conducted against him, namely that:

> Como began to harass Plaintiff Hawa on a daily basis, pestering him as to how the test messages "fell into the hands" of the Board Finance Committee. In connection thereto, Como demanded that Plaintiff Hawa provide him with Donato's previous cellular phone.

Am. Compl. ¶ 41, cited in Opp. at 10-11. The Amended Complaint does not elaborate on what actions comprised that alleged harassment or pestering. While an extended campaign of petty harassments could be sufficient in combination to support a claim for retaliation, see Suppan, 203 F.3d at 235, in the absence of allegations of specific retaliatory conduct, the conclusory statement that Como "harassed" and "pester[ed]" Hawa is insufficient to support a retaliation claim. "In light of Twombly, 'it is no longer sufficient to allege mere elements of a cause of action; instead a complaint must allege facts suggestive of [the proscribed conduct].'" Great W. Mining & Mineral Co., 615 F.3d at 177 (3d Cir. 2010) (quoting Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)). The Amended Complaint fails to meet that standard.

12

Hawa also argues that he has stated a valid First Amendment retaliation claim against Como because Como remained as Superintendent for approximately two weeks after Plaintiffs had disclosed the racist text messages to the School Board.  Opp.  at 11. Hawa claims that during those two weeks, Como was responsible for the conduct of his subordinates.  Id.  Specifically, he seeks to hold Como liable for various alleged actions of School Board member, Taylor.  Id. at 11-12.  Hawa relies on Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995), which held that the police officer in charge of a raid could be liable for civil rights violations committed in the raid if "he participated in violating [the plaintiffs'] rights, or . . . directed others to violate them, or . . . he, as the person in charge of the raid, had knowledge of and acquiesced in his subordinates' violations."

Como's argument is unavailing, however, because, as a School Board member, Taylor was not Como's subordinate.  Under Pennsylvania statute "the public school system of the Commonwealth shall be administered by a board of school directors . . . ." 24 Pa. Cons. Stat. § 3-301.  A school board is responsible for appointing and dismissing superintendents, id. § 5-508, and superintendents perform "such . . . duties as may be required by the board of school directors," id. § 10-1081.  Thus, even apart from the fact that the decision already had been made that Como would be forced to retire, Am. Compl. ¶ 38, Como was not in a position to direct or acquiesce in Taylor's conduct and consequently, cannot be held liable for it.  Hawa's Count I against Como fails to state "sufficient factual allegations to raise a reasonable expectation that discovery will reveal

evidence of the [necessary] elements."[4]  Connelly, 809 F.3d at 789.  Accordingly, Hawa's

Count I against Como must be dismissed.

### 2.  **Romaniello**

Hawa points to a number of actions by Romaniello that he contends constitute retaliation

for his disclosure of the racist emails.  Pl.'s Br. at 13-14.  First, Hawa alleges that Romaniello

offered to raise Powell's salary if she agreed not to bring any future litigation against CASD.

Am. Compl. ¶ 66.  Hawa does not explain how this offer of an inducement to Powell could

constitute retaliation against him.  Hawa next alleges that Romaniello directed school system

administrators to document their interactions with Hawa in order to "note when and if [he]

deviated from school policies or procedures."  Id. ¶ 82.  Hawa does not allege, however, that

Romaniello ever took any action to alter the material terms of his employment or even began any

disciplinary proceeding as the result of any deviations from school policies or procedures.  Even

had Romaniello launched a formal investigatory proceeding against Hawa, that alone would not

support a retaliation claim unless it resulted in a "subsequent demotion[ ], termination[ ],

reduction[ ] in pay, transfer[ ], or other similar adverse impacts on [Hawa's] employment

situation."  Lakkis, 994 F. Supp. 2d at 633; accord Hammond, 2015 WL 75168, at *4; Falat v.

Cty. of Hunterdon, No. 12-6804 FSH MAH, 2014 WL 6611493, at *10 (D.N.J. Nov. 21, 2014);

Herman, 2011 WL 4974181, at *3; see also Jones v. Se. Pa. Transp. Auth., 796 F.3d 323, 326

---

[4]     Moreover, none of Taylor's alleged conduct during the time before Como resigned is
sufficient to support a retaliation claim.  That conduct was comprised of: (1) allowing Como to
retire to avoid making the racist texts public; (2) offering Powell a "promotion in an effort to buy
her silence;" (3) telling Powell that Hawa was a turncoat and that he had "messed up;" and (4)
telling Powell that Taylor had a copy of Hawa's email to the District Attorney's Office.  Opp. at
12.  None of those actions, whether considered individually or cumulatively, are actionable
because they would not have deterred a person of ordinary firmness from exercising his or her
First Amendment rights.  O'Connor, 440 F.3d at 127-28.

(3d Cir. 2015) ("A paid suspension pending an investigation of an employee's alleged wrongdoing does not fall under any of the forms of adverse action mentioned by Title VII's substantive provision."); Joseph v. Leavitt, 465 F.3d 87, 91 (2d Cir. 2006) (same); Von Gunten v. Maryland, 243 F.3d 858, 869 (4th Cir. 2001) (same); Breaux v. City of Garland, 205 F.3d 150, 158 (5th Cir. 2000) (same as to First Amendment retaliation claim).  "[T]he terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances."  Joseph, 465 F.3d at 91.  Merely directing employees to collect evidence for use in a potential future disciplinary proceeding that never actually occurred is not a sufficient basis for a retaliation claim.

Hawa also alleges that Romaniello demanded that Hawa provide him with the network passwords to access CASD's computers on threat of insubordination and then proceeded to have the IT Department's hard drives imaged.  Am. Compl ¶¶ 104-06, 110-11.  Hawa has not, and cannot, state any basis on which he legitimately could deny CASD access to its own computer system.  Nor has he offered any explanation how CASD creating a copy of the hard drives in its IT Department, along with its network servers, id. ¶ 17, could constitute retaliation against him personally.  In the face of threatened civil litigation and an impending grand jury investigation, for CASD to preserve a copy of the computer system on the advice of its counsel was appropriate.[5]

Hawa further alleges that Romaniello, at the request of the CASD's counsel, demanded that Hawa provide a copy of the grand jury subpoena for Hawa's testimony along with the list of

---

[5]    Hawa attempts to impute to Romaniello some nefarious motive for the copying, implying that Romaniello was engaged in an effort to alter or erase potential evidence.  He offers nothing to support that theory beyond innuendo.  Creating a copy of the computer servers and hard drives is more consistent with preserving them than with destroying their contents.

documents sought by the subpoena.  Romaniello also allegedly instructed Hawa that he was not to remove or release any CASD documents without first clearing his intentions through Romaniello's office.  Id. ¶¶ 123-24.  CASD, as the owner of its own documents, was entitled to monitor and control the dissemination of its records subject only to any legal obligations imposed upon it by a valid subpoena.  Romaniello was not entitled to disseminate the CASD's records without its consent.  A demand that CASD documents be produced only with the agreement of the Superintendent, with the advice of its counsel, is hardly unusual.  There is no basis to consider it an act of retaliation aimed at Hawa.

Additionally, Hawa alleges that on the day following Powell's grand jury testimony, Romaniello directed Powell to meet with CASD's  Director of Human Resources, Zeigler, to answer questions regarding the discovery and handling of the racist text messages.  Zeigler then allegedly instructed Powell that she was not permitted to have counsel present for the interview and that her employment would be terminated if she did not comply.  Id. ¶¶ 127-34.  Regardless of the propriety of Zeigler's instructions to Powell, Hawa alleges that Powell refused to be interviewed, and that Zeigler dropped her demand and did not terminate Powell.  Id. ¶¶ 130-31.  Hawa does not allege that any such demand was directed to him.  There is no basis on which to conclude that Romaniello asking Powell to participate in an internal investigation was a form of retaliation against Hawa.

Finally, Hawa alleges that CASD hired outside counsel "for the purpose of reviewing Plaintiffs' conduct in order to justify their termination."  Id. ¶¶ 144-46.  As discussed above, the fact that an employer conducts an investigation without a resulting adverse employment action is not a sufficient basis to support a retaliation claim.  Hawa does not allege that Romaniello took

any action against him as the result of outside counsel's investigation.  He remains employed by CASD and has alleged no adverse change in the terms of his employment.

Thus, none of the alleged retaliatory conduct Hawa contends that Romaniello engaged in rises to the level of cognizable retaliation against Hawa for exercising his First Amendment rights.  Hawa has not pled facts that indicate that Romaniello took any action "intended to punish [him] for exercising [his] free speech rights."  O'Connor, 440 F.3d at 127-28.  Nor do Hawa's allegations suggest that discovery would permit him to meet his burden to demonstrate retaliation.  Conduct of which Hawa is unaware was unlikely to dissuade him from pursuing First Amendment activities.  Accordingly, Hawa's Count I against Romaniello must be dismissed.

### B.  Count III Must be Dismissed Because Hawa Has Not Alleged that Either Como or Romaniello Took Any Adverse Employment Action Against Him

In Count III of the Amended Complaint, Hawa alleges that Como and Romaniello retaliated against him in violation of 42 U.S.C. § 1981.  As stated previously, Section 1981 provides in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

The burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S 792, 802 (1973), applies to Section 1981 and Section 1983 retaliation claims.  Isler v Keystone Sch. Dist., No. 07cv1335, 2008 WL 3540603, at *3 (W.D. Pa. Aug. 12, 2008) (citing St. Mary's Honor Society v. Hicks, 509, U.S. 502. 506 n.1 (1983); Stewart v. Rutgers, the State Univ., 120 F.3d 426, 432 (3d Cir. 1997)).  Under that three-step framework, a plaintiff must first establish a prima facie case of retaliation.  Id.  If he or she does so, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employer's action."  Id.  If the

employer carries that burden, the plaintiff must prove by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination.  Id.  As discussed supra, to establish a prima facie case of discrimination, a plaintiff must show that: (1) he engaged in protected activity; (2) his employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action.  Estate of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 798 (3d Cir. 2010).  To survive the present Motion to Dismiss, Hawa need not establish a prima facie case, but his Amended Complaint must contain "sufficient factual allegations to raise a reasonable expectation that discovery will reveal evidence of the [necessary] elements."  Connelly, 809 F.3d at 789.

Here, Hawa's claim fails for the same reason that his First Amendment retaliation claim is deficient:  he has not pled facts sufficient to raise a reasonable expectation that discovery will allow him to present evidence to show that either Como or Romaniello took an adverse employment action against him.  To satisfy the second part of the test to establish a prima facie case of Section 1981 retaliation, Hawa must allege facts to show "that Defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising [his or] her rights."  Dubrey v. SEPTA, No. 11-4679, 2014 WL 4631987, at *3 (E.D. Pa. Sept. 16, 2014) (citing Lauren W. ex rel. Jean W. v. Deflaminis, 480 F.3d 259, 267 (3d Cir. 2007)).  Notably, the test for Section 1981 retaliation is less strict than that for First Amendment retaliation.  Compare id. (sufficient to deter a person with ordinary firmness) with O'Connor, 440 F.3d at 127-28 (even "relatively minor" retaliation is sufficient if committed with intent to punish for exercising First Amendment rights).  For the reasons discussed in Section III (A) supra, none of the conduct that Hawa has alleged that either Como or Romaniello committed is even relevant to establishing a

18

claim of retaliation.  Thus, Hawa's Amended Complaint fails "to raise a reasonable expectation that discovery will reveal evidence of the elements" of a Section 1981 claim," and Count III as to Hawa must be dismissed.  Connelly, 809 F.3d at 789.[6]

IV.    **CONCLUSION**

For all the foregoing reasons, Count II of the Amended Complaint as to both Plaintiffs is dismissed with prejudice and Counts I and III of the Amended Complaint as to Hawa only are dismissed without prejudice.[7]  An appropriate Order follows.


BY THE COURT:



*/s/ Marilyn Heffley*_____
MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE

---

[6]    Because Hawa has failed to state a claim, either for First Amendment retaliation or for Section 1981 retaliation, it is unnecessary to consider Defendants' arguments that Hawa's claims fail because he did not demand a judgment against either of them individually and that they are protected from his claims by qualified immunity.

[7]    Defendants did not move to dismiss Counts I and III with respect to the claims brought by Powell, and, therefore, those claims remain unaffected as to her.